STATE OF NORTH CAROLINA v. JOHNNIE LEE SPRUILL

No. 404A92

(30 December 1994)

**1. Jury § 259 (NCI4th)— first-degree murder—jury selection—peremptory challenges—racial discrimination**

Although the trial court in a first-degree murder resentencing hearing did not find or conclude that the defendant had met his burden of showing a *prima facie* case of discrimination in the use of peremptory challenges during jury selection, the court required each party to state reasons for its challenges and the case was treated as if the defendant had made out a *prima facie* case. In reviewing the issue of purposeful discrimination during jury selection, relevant considerations include the race of the defendant, victims, and key witnesses; the prosecutor's questions and statements during *voir dire*; the use of a disproportionate number of peremptory challenges to strike black jurors in a single case; and the acceptance rate of black jurors by the State. This case does not involve an interracial killing, most of the witnesses are African-Americans, the acceptance rate was 53%, while the prosecutor may have in part confused one prospective juror with another person, the prosecutor clearly stated a race-neutral reason manifestly supported by the record, defense counsel did not exercise his right of surrebutal to show the trial court that any of

State's proffered reasons constituted pretexts, and defendant made no independent argument based on Article I, Section 26, of the North Carolina Constitution.

**Am Jur 2d, Jury § 235.**

**Proof as to exclusion of or discrimination against eligible class or race in respect to jury in criminal case. 1 ALR2d 1291.**

**Use of peremptory challenge to exclude from jury persons belonging to a class or race. 79 ALR3d 14.**

**2. Jury § 145 (NCI4th)— first-degree murder—jury selection—questions concerning death penalty—challenges for cause ultimately granted—no error**

There was no error during jury selection for a first-degree murder resentencing hearing where defendant on appeal addressed an argument to the *voir dire* of a particular juror but included no assignment of error thereon, and assigned error to two others on the same ground but included no arguments, and the court granted defendant's challenges for all three for cause, so that there could be no error under *Morgan v. Illinois*, 119 L. Ed. 2d 492.

**Am Jur 2d, Jury §§ 201, 202.**

**3. Jury § 201 (NCI4th)— first-degree murder—denial of challenges for cause—trial court not partisan**

There was no error during jury selection for a first-degree murder resentencing hearing where defendant argued that the court showed partiality during jury selection in denying his motion to excuse for cause prospective juror Morgan and in denying the motion to excuse for cause prospective juror King after questions regarding crime and the death penalty where defendant used a peremptory challenge to excuse Morgan, renewed his challenges for cause as to these two prospective jurors, and the court granted defendant one additional peremptory challenge. Although the defendant contends that it is not possible to tell which denial the court intended to reverse, Morgan repeatedly said that she could follow the law on capital punishment even though she had some difficulty following the twists of *voir dire* questioning. The trial court must grant a challenge for cause only where a venireperson's responses indicate that her belief about

**STATE v. SPRUILL**

[338 N.C. 612 (1994)]

the death penalty would interfere with the performance of her duties. Any error as to prospective juror King was cured by granting an additional peremptory challenge, and the trial court's conduct did not amount to partisan conduct denying defendant a substantial right.

**Am Jur 2d, Jury §§ 289, 290.**

**Comment Note.—Beliefs regarding capital punishment as disqualifying juror in capital case—post-*Witherspoon* cases. 39 ALR3d 550.**

**4. Jury § 141 (NCI4th)— first-degree murder—jury selection—questions as to parole not permitted—no error**

There was no error in jury selection for a first-degree murder resentencing hearing where the trial court denied defendant's motion to permit questioning of prospective jurors on their beliefs about parole eligibility. Although in *Simmons v. South Carolina*, 129 L. Ed. 2d 133 (1994), the United States Supreme Court held that due process had been violated where the state had secured a death sentence partly on the ground of future dangerousness while concealing from the jury the true meaning of a noncapital sentencing alternative, in this case it would have been entirely reasonable for the jury, if given accurate information about parole, to view defendant as a greater threat to society; the two prosecutors' arguments, which consume over 100 pages of the transcript, included only one reference to defendant's future dangerousness; and defendant's jury did not submit to the trial court a question about the effect of a life sentence as in *Simmons*. The State has answered arguments that defendants should have been permitted to inform juries that a life sentence in North Carolina means the defendant must serve twenty years in prison before he is eligible for parole with the argument that it should be able to respond with accurate information about such related issues as the possibility of pardon and commutation; it appears that common-law precedents excluding such information from the jury's consideration have offered capital defendants greater protection than does federal law.

**Am Jur 2d, Jury §§ 201, 202.**

STATE v. SPRUILL

[338 N.C. 612 (1994)]

5. **Criminal Law § 1312 (NCI4th)— first-degree murder— resentencing hearing—reference to prior death sentence— no error**

There was no error in a first-degree murder resentencing hearing where the prosecutor, while cross-examining a psychiatrist, read from a report made by a Central Prison psychiatrist after defendant's first trial which contained a reference to the death row. The prosecutor made only one mention of death row and the record makes clear that it was inadvertent; the remark went unnoticed by defense counsel or the court when it was made and so was never brought to the jury's attention by way of an objection or limiting instruction; defendant did not move for a mistrial; and it was clear from other testimony that defendant had been in prison since 1984, from which the jury could have inferred that defendant had previously been sentenced to death because otherwise he would not be receiving a new capital sentencing hearing. Although defendant contends that *State v. Simpson*, 331 N.C. 267, mandates inquiry into the issue of prior knowledge of a death sentence when it becomes apparent that a juror has such knowledge, this case does not involve exposure to potentially prejudicial media exposure outside the courtroom; the exposure here occurred during cross-examination with defense counsel present; defendant not only had the opportunity to observe the extent and manner in which jurors were exposed, but to have a limiting instruction and, if desired, to request an inquiry, but did not make such a request and specifically rejected the trial court's offer to instruct the jury; and the jury's knowledge, if any, of defendant's previous death sentence, could not with certainty be attributed solely to conduct of the prosecutor.

**Am Jur 2d, Evidence §§ 427 et seq.**

6. **Criminal Law § 1312 (NCI4th)— first-degree murder— resentencing hearing—photographs of cellblock—argument that defendant in secure cell block**

There was no error in a first-degree murder resentencing hearing from the introduction of photographs of the cellblock in which defendant had lived since 1985 and the argument that defendant was under a twenty-four hour watch in the most secure cell block in the most secure prison in the State of North Carolina. Defendant requested several mitigating circumstances based on his time in confinement, and it was clear from defendant's evidence that he had been in maximum security in Central Prison for

six or more years dating roughly from the time of the murder. If the jury learned from defendant's evidence that he had previously received a death sentence, defendant cannot be heard to complain that the State argued against mitigation from that same evidence.

**Am Jur 2d, Evidence §§ 427 et seq., 960 et seq.**

7. **Criminal Law § 382 (NCI4th)— first-degree murder— resentencing hearing—questions by court to psychologist—no error**

There was no error in a first-degree murder resentencing hearing where the court asked defendant's expert witness questions concerning an opinion involving mitigation. Although defendant contends that the trial court improperly expressed an opinion that the psychologist's evidence was deficient or suspect as to proof of mitigation, the questions did not denigrate either defendant's witness or her evidence, but instead helped to develop testimony favorable to the defense and to assist the trial court in deciding whether mitigating circumstances which might later be requested by the defense were in fact supported by the evidence.

**Am Jur 2d, Trial §§ 274, 275.**

8. **Criminal Law § 400 (NCI4th)— first-degree murder— resentencing hearing—judge turning back during defendant's testimony—no error**

There was no error during a first-degree murder resentencing hearing where the trial judge turned his back during defendant's testimony but nothing of record indicates where, in relation to the judge's position, the defendant was sitting, whether the judge's back was partially or fully turned, or how long his back might have been turned; the transcript is devoid of any indication that the court in fact took such action; record facts suggest that the judge could not have had his back to defendant more than a few minutes; and, even assuming that the trial judge may have turned his back for a few minutes during defendant's direct examination, the record does not clearly show any prejudice to defendant.

**Am Jur 2d, Trial §§ 272 et seq.**

9. **Criminal Law § 441 (NCI4th)— first-degree murder— resentencing hearing—prosecutor's argument regarding psychologists**

There was no error in a first-degree murder resentencing hearing where, assuming arguendo that the prosecutors' statements regarding defense experts' testimony concerning defendant's mental disorders were improper and should have been condemned by the trial court, they do not entitle defendant to a new resentencing proceeding because the thrust of the lengthy arguments was not that the witnesses had been paid, but that their testimony did not provide a factual basis for finding personality disorder or blackout spells independent of seizures arising from a disorder. The statements are nothing like those made by the prosecutor in *State v. Sanderson*, 336 N.C. 1.

**Am Jur 2d, Trial §§ 695.**

**Propriety and prejudicial effect of counsel's negative characterization or description of witness during summation of criminal trial—modern cases. 88 ALR4th 209.**

10. **Criminal Law § 447 (NCI4th)— first-degree murder— resentencing hearing—prosecutor's argument—victim**

The trial court did not err by not intervening *ex mero moto* in the prosecutor's closing argument in a first-degree murder resentencing hearing where the prosecutor's remarks concerning the victim were indistinguishable from those in *State v. Artis*, 325 N.C. 278.

**Am Jur 2d, Trial §§ 664 et seq.**

**Propriety and prejudicial effect of prosecutor's remarks as to victim's age, family circumstances, or the like. 50 ALR3d 8.**

11. **Criminal Law § 415 (NCI4th)— first-degree murder resentencing hearing—prosecutor's arguments**

Arguments in a first-degree murder resentencing hearing that defendant had enjoyed stalking and killing the victim; was a "hound of hell," lay in wait for the victim "like a durned snake," and changed "like a lizard changes colors"; took notes during the arguments; attempted to lay blame for the murder on his father; perjured himself in testifying that he had not been convicted of possession of stolen property; colluded with his attorneys to pre-

sent himself as remorseful; and chose to affirm rather than swear to tell the truth were within the wide latitude permitted counsel in arguments to the jury.

**Am Jur 2d, Trial §§ 554 et seq.**

**Negative characterization or description of defendant, by prosecutor during summation of criminal trial, as ground for reversal, new trial, or mistrial—modern cases. 88 ALR4th 8.**

12. **Criminal Law § 458 (NCI4th)— first-degree murder resentencing—closing arguments—parole—comment during objection**

There was no error during a first-degree murder resentencing hearing where defense counsel asked the jury not to kill defendant but to put him in prison for the rest of his life and the prosecutor objected with the comment "That's not what happens." The trial court properly overruled the objection and defendant was permitted to argue again that his adjustment to prison was another reason not to take his life. No case has been found holding that the court must instruct the jury to disregard the objection.

**Am Jur 2d, Trial §§ 575, 576.**

**Prejudicial effect of statement of prosecutor as to possibility of pardon or parole. 16 ALR3d 1137.**

13. **Criminal Law § 1355 (NCI4th)— first-degree murder—resentencing—instructions—mitigating factor—no prior criminal activity**

There was no plain error in a first-degree murder resentencing hearing where defendant contended that the court's wording of its instruction on the statutory mitigating circumstance that the defendant had no significant history of prior criminal activity expressed the court's opinion by presenting the evidence in the light most favorable to the State. Read in its entirety, the instruction did not constitute an improper expression of opinion which probably resulted in the jury's reaching a different verdict. N.C.G.S. § 15A-2000(f)(1).

**Am Jur 2d, Criminal Law §§ 598, 599; Trial § 1204.**

**14. Criminal Law §§ 1357, 1360 (NCI4th)— first-degree murder—resentencing—mitigating circumstances—instructions—mental disturbance and impaired capacity**

There was no plain error in a first-degree murder resentencing hearing in the instructions on mental or emotional disturbance and impaired capacity where defendant contended that the court's use of "and" meant that a juror's failure to find any one of the factual elements meant consideration of the circumstance was entirely precluded, but, read in its entirety, the jurors could not have applied the instruction in a way that prevented "consideration of constitutionally relevant evidence."

**Am Jur 2d, Criminal Law §§ 598, 599; Trial §§ 1120 et seq.**

**15. Criminal Law § 1323 (NCI4th)— first-degree murder—resentencing—instructions—use of discretion in considering mitigating circumstances**

There was no plain error in a first-degree murder resentencing hearing where defendant contended that the court erred by instructing the jury that jurors could exercise their discretion in deciding whether to consider any mitigating circumstance found in Issue Two when answering Issues Three and Four. Instead of precluding any individual juror from considering any mitigating circumstance or circumstances she or he found at Issue II, these instructions plainly directed that the evidence in mitigation, if found by one or more jurors, had to be weighed against the evidence in aggravation. The instructions are in accord with the dictates of *McKoy* and could not have been misapplied by the jury.

**Am Jur 2d, Trial §§ 1441 et seq.**

**16. Criminal Law § 1362 (NCI4th)— first-degree murder—resentencing—mitigating circumstances—age of defendant**

The trial court did not err in a first-degree murder resentencing hearing by failing to submit the mitigating circumstance of defendant's age where defendant contended that chronological age is not the determining factor and the circumstance was supported by evidence that he was an immature and dependent person who had borderline intelligence, but defendant did not request that the trial court submit this mitigating circumstance to the jury and the evidence showed that he was thirty-one years old, had worked as an automobile mechanic and in a shipyard,

moved on to a better position, attended church, and functioned quite well in the community. N.C.G.S. § 15A-2000(f)(7).

**Am Jur 2d, Trial §§ 1441 et seq.**

**17. Criminal Law § 1363 (NCI4th)— first-degree murder— resentencing—nonstatutory mitigating circumstances—no prior felony involvement**

The trial court did not err in a first-degree murder resentencing hearing where defendant argued that the court failed to submit that defendant had no prior felony involvement, but the statutory mitigating circumstance that defendant had no significant history of criminal activity was submitted and the instruction on this circumstance included an accurate summary of the evidence presented, which showed defendant's prior criminal activity included some offenses resulting in charges and convictions and other offenses which had not resulted in charges or convictions.

**Am Jur 2d, Trial §§ 1441 et seq.**

**18. Criminal Law § 1323 (NCI4th)— first-degree murder— resentencing—nonstatutory mitigating circumstances— combined—no error**

There was no error in a first-degree murder resentencing hearing where the court combined aspects of defendant's mitigating evidence when submitting nonstatutory mitigating circumstances.

**Am Jur 2d, Trial §§ 1441 et seq.**

**19. Jury § 103 (NCI4th)— first-degree murder—individual voir dire denied—no error**

The trial court did not err in a first-degree murder resentencing hearing by denying defendant's motion for individual jury *voir dire*.

**Am Jur 2d, Jury § 197.**

**20. Jury § 150 (NCI4th)— first-degree murder—sentencing— voir dire—defendant denied right to question jurors challenged by State**

The trial court did not err in a first-degree murder resentencing hearing by denying defendant the right to examine each juror challenged by the State during death qualification.

**Am Jur 2d, Jury §§ 201, 202.**

**21. Evidence and Witnesses § 876 (NCI4th)— first-degree murder—sentencing—hearsay statements by victim—state of mind—admissible**

The trial court did not err in a first-degree murder resentencing hearing by admitting hearsay statements of the victim relating to her state of mind.

**Am Jur 2d, Evidence § 866.**

**22. Criminal Law § 1348 (NCI4th)— first-degree murder—sentencing—instruction defining mitigation denied—no error**

The trial court did not err in a first-degree murder resentencing hearing by denying defendant's request for an instruction defining "mitigation."

**Am Jur 2d, Criminal Law §§ 598, 599; Trial §§ 1441 et seq.**

**23. Criminal Law § 1363 (NCI4th)— first-degree murder—sentencing—nonstatutory mitigating circumstance—determination of mitigating value**

The trial court did not err in a first-degree murder resentencing hearing by instructing the jurors that it was for them to determine whether the nonstatutory mitigating circumstances in fact possessed mitigating value.

**Am Jur 2d, Criminal Law §§ 598, 599; Trial §§ 1441 et seq.**

**24. Criminal Law § 1343 (NCI4th)— first-degree murder—sentencing—especially heinous, atrocious or cruel aggravating circumstance—not unconstitutionally vague**

The especially heinous, atrocious, or cruel aggravating circumstance is not unconstitutionally vague.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was heinous, cruel, depraved, or the like—post-*Gregg* cases. 63 ALR4th 478.**

**Supreme Court's views on constitutionality of death penalty and procedures under which it is imposed or carried out. 90 L. Ed. 2d 1001.**

**25. Criminal Law § 1373 (NCI4th)— first-degree murder— death sentence—not disproportionate**

A sentence of death for first-degree murder was not disproportionate where the record supports the jury's finding of the sole aggravating circumstance upon which the death sentence was based; nothing of record suggests that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and the sentence was not disproportionate. Characteristics distinguishing this case include a murder preceded by physical and mental abuse, including assaults and threats; a senseless and brutal public stabbing found to be especially heinous, atrocious, or cruel by the jury; and a distinct failure of the defendant to ·show remorse after the killing. Further, of twenty-three mitigating circumstances submitted, the jury rejected twenty-two, finding the existence of only one nonstatutory circumstance, that the defendant suffered from a personality disorder with dependency traits.

**Am Jur 2d, Criminal Law § 628.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was heinous, cruel, depraved, or the like—post-*Gregg* cases. 63 ALR4th 478.**

**Validity of death penalty, under Federal Constitution, as affected by consideration of aggravating or mitigating circumstances—Supreme Court Cases. 111 L. Ed. 2d 947.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Britt (Joe Freeman), J., at the 12 October 1992 Criminal Session of Superior Court, Northampton County, upon a plea of guilty to first-degree murder. Heard in the Supreme Court 17 March 1994.

*Michael F. Easley, Attorney General, by Charles M. Hensey, Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Staples Hughes, Assistant Appellate Defender, and Gretchen M. Engel, Death Penalty Resource Center, for defendant-appellant.*

PARKER, Justice.

In 1985 defendant was convicted of the first-degree murder of his former girlfriend, Beatrice Williams, and was sentenced to death. On

appeal this Court affirmed defendant's conviction and sentence. *State v. Spruill*, 320 N.C. 688, 360 S.E.2d 667 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 934 (1988). On 21 February 1992, the trial court granted defendant's motion for appropriate relief, vacated the order sentencing defendant to death, and ordered a new trial. A capital trial began on 12 October 1992, but on 20 October defendant elected to plead guilty to the charge of first-degree murder.

In support of defendant's plea, the prosecutor summarized the State's evidence. In March 1984 defendant and victim, both African-Americans, had been romantically involved; but the victim had ended their relationship. On the night of 31 March, they went separately to a nightclub where defendant attempted to talk to the victim, who decided it would be best for her to leave. Defendant followed her to the door, where he stood very close to her, regarding her steadily. The victim was crying, shifting her weight from one foot to the other, and wringing her hands. She walked outside, and defendant followed, his hand in his pocket. A bystander observed the two and decided to try to help the victim to her car. At the car, the victim opened the door, but defendant blocked her way and stabbed at her as she got into the car, cutting her across the chest and on one of her hands. Some bystanders pulled defendant away, and he said he would not bother the victim any more. However, defendant got into the car and slashed the victim's throat. Again he was pulled away, and someone asked him why he had killed her. He said, "I meant to do it; I meant to do it." In the summer of 1983 defendant had threatened to kill the victim and had stalked her. About two weeks before her death, defendant had knifed her and on an earlier occasion had attempted to choke her. At the time of the murder, defendant was subject to a court order directing him to stay away from the victim.

Pursuant to N.C.G.S. § 15A-2000, a capital sentencing proceeding was conducted, and both parties offered evidence. State's evidence included testimony from Harold Williams, Joe Louis Jackson, and Corrine Simmons, all of whom were present at the time of the murder. Their testimony was consistent with State's factual summary. Further, Corrine Simmons, Lemile Lockhart, Helen Britton, and Rosa Williams testified about defendant's drinking and his stalking and assaulting of the victim; and their testimony was consistent with the prosecutor's summary. Simmons also testified that in September 1983 she heard defendant threaten to kill the victim. In the same month, she heard defendant threaten to put the victim and her son "six foot

[sic] under." In addition to her other testimony, Helen Britton denied seeing defendant use marijuana or other drugs.

State Highway Patrolman D.E. Harris testified that he responded to a dispatch about the murder at the nightclub and drove towards the scene. About a mile south of the club, Trooper Harris saw a man who fit the description of the suspect running along the road. Harris stopped his car, got out, and called to the man, who put his hands in the air and began walking towards Harris. The man was defendant, who said he was the one Harris was looking for and the knife he used was in his pants pocket. Defendant appeared calm, his speech was not slurred, and he did not smell of alcohol or marijuana. Chief Deputy Otis Wheeler patted defendant down and advised him of his rights at the Northampton Sheriff's Department. Defendant said he understood his rights. He was calm; nothing appeared to be wrong with him. However, after his arrest, defendant had to be taken to the hospital several times on account of seizures. Eventually he was moved to Central Prison, where appropriate treatment was available.

Defendant's evidence included the testimony of several family members and friends who described his chaotic upbringing. Defendant was one of eight siblings, and his father kept the entire family in poverty and terror by drinking to excess and then striking them, depriving them of food, shooting at them, or driving them away from home. On one occasion when defendant's father attempted to strike defendant's brother with a poker, defendant stepped between the two and took a blow to his head. As an adult, defendant suffered occasional seizures and headaches severe enough to require hospitalization. Nevertheless he could do almost any kind of mechanical work and was steadily employed. He was known to drink to excess, but no witness testified that he was violent when drinking. While working at a shipyard in Newport News, Virginia, defendant met Gloria Williams, and they had a son, Sherrod, who was eighteen years old at the time of the sentencing proceeding.

James Odom testified that he ran a service station in Jackson, North Carolina, and had known defendant from defendant's childhood. Defendant worked for Odom for several years, ending in 1978. Defendant changed oil, washed cars, drove a cab, and did mechanical work. He learned to perform minor mechanical work unsupervised; he could change engines in cars under Odom's supervision.

Several witnesses who knew defendant in prison testified in his behalf. Chaplain Michael Smith met defendant in 1986, counselled

him, and participated regularly in religious services with him. In Smith's opinion, defendant was sincere in his religious beliefs. Correctional Officer Thomas Humphrey also met defendant around 1986. Humphrey testified that defendant attended religious services regularly and although defendant had committed some disciplinary infractions, Humphrey had never had to report him. Chaplain Luther Pike met defendant in 1985 and since then had made weekly contact with him. Pike testified that defendant had responded positively to programs in which Pike was involved and defendant's behavior never created problems. Like Smith, Pike thought defendant was sincere in his religious beliefs.

Dr. James Groce was accepted by the court as an expert in forensic psychiatry. Sometime around late 1984 he examined defendant at the request of defense counsel. Groce testified that defendant had an IQ of 64 and read at the 5.5 grade level, both being consistent with mild mental retardation. Defendant suffered from a seizure disorder, but his reported actions on the night of the murder were inconsistent with seizure behavior. Defendant's retardation resulted in an impairment of his judgment; and he reported multiple drug use on the night of the murder, which also would have had an impairing effect. Dr. Groce testified he had made three diagnoses: Mild mental retardation, a medical diagnosis of seizure disorder, and a conversion disorder with paralysis of the legs. In Dr. Groce's opinion, at the time of the murder defendant was under a mental disturbance, namely mild mental retardation. Defendant's capacity to appreciate the criminality of his conduct or conform it to law was impaired by his retardation and use of drugs, which together produced a negative synergistic effect. Defendant told Dr. Groce that on the night in question he drank three or four beers and smoked marijuana. The marijuana was given to defendant by a friend, who told him it was laced with phencyclidine. Nevertheless, reports of defendant's behavior on the night of the murder were consistent with goal-directed, rational behavior.

Dr. Groce testified further that in February 1985 a psychiatrist at Central Prison noted that defendant's cognition was "fair," his insight was "poor," his judgment was "fair," and his recognition of his personality type was "poor." "Cognition" refers to recognition, general knowledge, and accurate interpretation of general knowledge at the moment. "Insight" means some accurate self-assessment of situations and personal functioning. "Judgment" is the ability to make accurate assessments of situations and appropriate plans based thereon. The psychiatrist's diagnosis was one of mixed personality disorder with

inadequate and dependent features. Personality disorder is characterized by a less than usual ability to adjust appropriately to situations. Mixed personality disorder is characterized by several features. "Inadequate and dependent features" refer to (i) a tendency to depend excessively on external sources for emotional support and to weigh reactions of others heavily and (ii) general immaturity and inability to cope with stressful situations. Dr. Groce also testified that the combined effects of such a personality disorder and low IQ are additive, each condition contributing to overall impaired function.

Dr. Groce also examined defendant in 1992 and noted that his full-scale IQ was 73, placing him in the low borderline range of intellectual functioning. The elevation in IQ was consistent with prolonged sobriety. During his 1992 evaluation, defendant stated that at the time of the murder he had also snorted cocaine.

Dr. Claudia Coleman, a specialist in neuropsychology and forensic psychology, examined defendant in October 1992 at the request of defense counsel. In her opinion defendant was in the borderline range of adult intelligence. His school records showed he was a slow learner and was placed in special education classes beginning in ninth grade. He repeated a grade and dropped out of school in eleventh grade. Dr. Coleman considered defendant's head injury significant because many people who suffer major head injuries (i) experience concentration and attention problems and problems with judgment and emotional control and (ii) are more susceptible to the effects of alcohol and other drugs. Dr. Coleman opined that the following factors impaired defendant's cognitive abilities and emotional control: (i) history of head injury severe enough to induce chronic headaches and seizure disorder, (ii) history of alcohol and possibly other drug abuse, (iii) possible intoxication at the time of the murder, and (iv) borderline intelligence. Further, owing to these factors, at the time of the murder defendant was acting under the influence of mental or emotional disturbance; and his capacity to appreciate the criminality of his conduct or to control his conduct was impaired. Dr. Coleman stated further that defendant had inadequate and dependent personality traits, being overly dependent on others, particularly for emotional support. He was immature, acting more like a child than others in his age group. On cross-examination, she testified that a number of his behaviors on the night of the murder could be characterized as goal-oriented.

**STATE v. SPRUILL**

[338 N.C. 612 (1994)]

Defendant testified in his own behalf, and his testimony about his chaotic childhood was consistent with that of other witnesses. After his relationship with Gloria Williams ended and while he was working for James Odom, defendant met and married a woman named Barbara Edwards. During his marriage defendant drank alcohol and smoked marijuana almost daily. He also tried other drugs but did not use them on a regular basis. He met the victim in 1982, was involved with her until 1984, and thought they had a good relationship. Nevertheless, there were times when they fought and did not see each other for several weeks. He admitted slapping the victim sometime around Thanksgiving 1983 but denied choking her. He maintained that in the incident two weeks before her death, the victim accidentally cut herself on his knife, which he was using to clean his fingernails.

Defendant testified further that on 31 March 1984, he awoke, did a line of cocaine, and then went to work. He had several beers at work since his boss let him drink there if he did not leave cans lying about. He left work around 2:00 p.m. and had a few more beers. That night he went to the club and had several more beers. He saw the victim come into the club with a friend. Defendant went outside and smoked some marijuana with a man he knew. Defendant remarked that the joint tasted odd; the man said it contained PCP. Defendant recalled going back into the club and trying to talk to the victim, but he could not remember what was said. He remembered Harold Williams staring at him. Defendant recalled going outside with the victim but could not remember what he said to her. He admitted that he had cut and killed her but thought it would not have happened had he not been drinking alcohol and using drugs. He expressed remorse for having killed the victim.

He testified further that at Central Prison he had three fights with other inmates and several other disciplinary violations, most occurring within the first two or three years of his incarceration. On cross-examination he testified that he had been convicted of misdemeanor possession of stolen property. In connection with the Thanksgiving 1983 incident he pleaded guilty to assaulting the victim. He denied following the victim, threatening to kill her or her son, and intentionally cutting her. He also denied that he had assaulted his wife. On recross-examination, defendant testified that PCP does not cause the user to act drunk or fall down. Instead it causes the user to be "spaced out" and able to remember some things but not others.

STATE v. SPRUILL

[338 N.C. 612 (1994)]

State's rebuttal evidence included testimony from Deputy Wheeler, who said that around 1:45 a.m. on 1 April 1984, defendant appeared to be calm and cool. Asked if he were under the influence of alcohol or drugs, defendant said, "No," paused, and stated he had had a beer or two.

In addition, the State introduced evidence of defendant's convictions for misdemeanor possession of stolen goods and for assault on and communicating threats against the victim in November 1983. Further, Sergeant Ray Campbell, supervisor of inmate records at Central Prison, described defendant's cellblock from 1985 until the time of trial. Illustrating his testimony with photographs, Campbell described the restrictions on defendant's freedom of movement, comparing these with lesser restrictions on other inmates. Campbell testified that defendant had a major infraction in October 1985 for fighting, a July 1986 infraction for assaulting the inmate with whom he had been fighting in 1985, an April 1988 major infraction for refusing to report to his cell, a July 1988 infraction for fighting, a December 1989 infraction for using a mop wringer to threaten other inmates, an August 1990 major infraction for fighting, and an October 1990 major infraction for disobeying orders by entering a cell not assigned to him. Punishment, which consisted of confinement to his cell, was suspended on the last two infractions.

Barbara Spruill testified that in 1977 she was married to defendant but left him after four months because he was mean to her and picked fights with her until he provoked her to hit him. Once he ran her car off the road, reached into the car and choked her, and then left. On cross-examination she testified that when they were first married, defendant was kind to her and fun to be around except when drinking. He drank on weekends with friends and also stayed out late at night during the week and drank. He drank more after they were married. He also smoked marijuana and sometimes drank and smoked at the same time. Sometimes he accused her of seeing other men. The choking incident occurred after she left him.

The jury found the existence of the sole aggravating circumstance submitted, that the murder "was especially heinous, atrocious, or cruel." N.C.G.S. § 15A-2000(e)(9) (1988). Four statutory mitigating circumstances were submitted, but the jury declined to find the existence of any. Of the nineteen nonstatutory mitigating circumstances submitted, the jury found only one, that at the time of committing the crime, "defendant suffered from a personality disorder with depend-

STATE v. SPRUILL

[338 N.C. 612 (1994)]

ency traits." Pursuant to section 15A-2000(b), the jury found that (i) the mitigating circumstance was insufficient to outweigh the aggravating circumstance and (ii) the aggravating circumstance was sufficiently substantial to call for imposition of the death penalty. On 4 November 1992 the jury recommended that defendant be sentenced to death, and the trial court entered judgment in accord therewith. Execution was stayed 18 November 1992 pending defendant's appeal. For the reasons discussed herein, we conclude defendant's capital sentencing proceeding was free from prejudicial error and the death sentence is not disproportionate.

JURY SELECTION

[1] Defendant first contends the State exercised its peremptory challenges in a racially discriminatory manner, excusing jurors of African-American descent in violation of the federal and state constitutions. Defendant argues that eight prospective jurors, Bottoms, Squire, Joyner, Lowe, Phillips, Grant, Walton, and Liverman, were improperly excused. We disagree.

Defendant filed a motion in limine requesting the trial court "to prohibit the District Attorney from exercising peremptory challenges as to Black jurors, or, in the alternative, to order that the District Attorney state reasons on the record for peremptory challenges of such jurors." The motion stated that the district attorney for Judicial District 6B had shown a pattern of discriminating against black venirepersons and cited *State v. Smith*, 328 N.C. 99, 400 S.E.2d 712 (1991), and *State v. Hall*, 104 N.C. App. 375, 410 S.E.2d 76 (1991), as cases from the district in which the appellate courts have found inferences of such discrimination. The trial court denied the motion. During jury selection, after the State peremptorily challenged eight African-American venirepersons, defendant objected and asked to be heard. The trial court stated, "Well, if you're making a Batson motion, I'll hear you later." The district attorney then stated that defense counsel had

excused twelve White jurors and one Black juror, and I could have made that motion, I felt three times I could, but I have not done so. And the first eleven of his were White, I take that back, the first twelve of his were White and the last one was Black. And I make the same motion in this particular case.

The court responded, "I understand and I'll hear you later, too."

STATE v. SPRUILL

[338 N.C. 612 (1994)]

After completion of selection of twelve jurors and two alternates, court was recessed and reconvened without any jurors present. The trial court brought up the matter of the motions and asked first to hear from defense counsel. After considerable discussion, counsel for both parties agreed that the State had excused eight black jurors and five white jurors. The prosecutor then argued that under *Georgia v. McCollum*, 505 U.S. ——, 120 L. Ed. 2d 33 (1992), the defense also was prohibited from engaging in purposeful discrimination in the exercise of peremptory challenges to exclude prospective jurors. The court then asked, "All right, Solicitor, do you care to put on the record an explanation as to each of these?" The prosecutor replied as follows:

> If Your Honor please, I think that where the defendant has excused, if I may just briefly say what he [h]as excused by my count, fourteen jurors altogether, maybe fourteen or fifteen. How many is it altogether, madam clerk?

> Ms. SPRUILL: Fifteen.

> Fifteen jurors altogether. And of those fifteen jurors, thirteen of those were White that he excused; that he excused eleven in a row until he got to the twelfth one, and that was a Black juror, and that was Mr. Royal, which was the first Black juror that he— let me go back. He had fifteen excuses and of those fifteen, fourteen were used for White jurors.

> . . . .

> Now, if Your Honor please, before I—this is the way I feel about it. I'll do whatever the Court directs me to do, but before I state any reasons for the reasons that I have excused the jurors that I have, where someone has excused fourteen, fourteen times one, a hundred and forty per cent of them, I think they ought to go through everyone [sic] of theirs and give the reasons why.

The court stated that looking at the contentions of both sides, it appeared that the State had come closer to making out a prima facie case than had the defense. Nevertheless, the court required each party's counsel to state reasons for the peremptory challenges objected to by opposing counsel. The court then stated as follows:

> All right. The Court accepts the Solicitor's clear and race neutral specific explanations as to his reasons for peremptorily challenging the eight Black jurors. Therefore, Court concluding that the explanations are race neutral denies your motion to set aside this panel and start anew, Mr. Warmack.

And as to the fourteen Whites that were challenged by the defense, the Court accepts the explanations of Mr. Warmack as clear and race neutral specific explanations as to the exercise of those peremptories.

The jury which heard defendant's case consisted of six white and six African-American members.

The Equal Protection Clause of the United States Constitution prohibits a prosecutor from challenging prospective jurors "solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." *Batson v. Kentucky*, 476 U.S. 79, 89, 90 L. Ed. 2d 69, 83 (1986); *accord State v. Glenn*, 333 N.C. 296, 301-02, 425 S.E.2d 688, 692 (1993). Although the *Batson* three-part test for reviewing claims of racial discrimination requires a defendant to make out a prima facie case of discrimination, where prosecutors voluntarily give reasons for their challenges, this Court proceeds as though the burden has been met. *State v. Robinson*, 336 N.C. 78, 93, 443 S.E.2d 306, 312 (1994), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 650 (1995).

In the instant case, the trial court did not find or conclude that the defendant had met his burden. Instead, the record indicates the court was more inclined to find a prima facie case of discriminatory intent on the part of the defense. Nevertheless, since the record suggests that the court considered it in the interest of justice and general fairness to require each party to state reasons for its challenges, we treat the case as though defendant made out a prima facie case.

The second part of the *Batson* test "requires the State to 'articulate legitimate reasons which are clear and reasonably specific and related to the particular case to be tried which give a neutral explanation for challenging jurors of the cognizable group.' " *Id.* (quoting *State v. Jackson*, 322 N.C. 251, 254, 368 S.E.2d 838, 840 (1988), *cert. denied*, 490 U.S. 1110, 104 L. Ed. 2d 1027 (1989)). "Defendant 'has a right of surrebuttal to show that the prosecutor's explanations are a pretext.' " *Smith*, 328 N.C. at 120, 400 S.E.2d at 724 (quoting *State v. Porter*, 326 N.C. 489, 497, 391 S.E.2d 144, 150 (1990)). Finally, it is for the trial court to decide whether the defendant has proved purposeful discrimination. *Robinson*, 336 N.C. at 93, 443 S.E.2d at 312.

In reviewing the issue of purposeful discrimination during jury selection, this Court has considered a number of facts and circum-

stances. Relevant considerations include (i) race of the defendant, victims, and key witnesses; (ii) the prosecutor's questions and statements during *voir dire*; (iii) use of a disproportionate number of peremptory challenges to strike black jurors in a single case; and (iv) acceptance rate of black jurors by the State. *Smith*, 328 N.C. at 120-21, 400 S.E.2d at 724. Notwithstanding defendant's motion in limine, in accord with the test established by the United States Supreme Court, this Court reviews each case involving a *Batson* issue on its individual merits. More importantly, however, the instant case differs from *Smith* in that it does not involve an interracial killing, and most of the witnesses are African-Americans. In addition, in *Smith* the Court stated that an acceptance rate of 42.8% is some evidence that there was no discriminatory intent; and in the instant case, the acceptance rate was 53%.

In *Robinson*, the Court also said as follows:

> When evaluating the prosecutor's stated reasons for dismissal, the ultimate question to be decided by the trial court is whether the prosecutor was exercising his peremptory challenges with a discriminatory intent. The United States Supreme Court has acknowledged that, "[a]s with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.'" *Hernandez*, 500 U.S. at 365, 114 L. Ed. 2d at 409 (quoting *Wainright v. Witt*, 469 U.S. 412, 428, 83 L. Ed. 2d 841, 854 (1985)). The findings of a trial court are not to be overturned unless the appellate court is "convinced that its determination was clearly erroneous." *Id.* at 36[9], 114 L. Ed. 2d at 412. " 'Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.' " *Thomas*, 329 N.C. at 433, 407 S.E.2d at 148 (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 574, 84 L. Ed. 2d 518, 528 (1985).

336 N.C. at 94, 443 S.E.2d at 313.

With these principles in mind, we have reviewed the reasons given by the prosecutor for peremptorily challenging the prospective jurors named above and find no reason to overturn the trial court's judgment. Defendant has argued that of the prosecutor's stated reasons for excusing prospective juror Bottoms, only one, that Bottoms knew defense counsel Harvey, was supported by the record. We do not find this argument persuasive. While our review of the transcript suggests that the prosecutor may have in part confused Bottoms with

another venireperson, the prosecutor stated clearly that he excused Bottoms because he "knew [defense counsel] Thomas Harvey, and he was the one who had visited—Mr. Harvey had visited his house, seeing his mother and his sister." Since this race-neutral reason is manifestly supported by the record, any confusion as to the prosecutor's other statements about Bottoms could at most present another view of the evidence, which under *Robinson* is insufficient to permit this Court to find the trial court's determination clearly erroneous. We also note that although given an opportunity to respond, defense counsel did not exercise his right of surrebuttal to show the trial court that any of State's proffered reasons constituted pretexts. Further, before this Court, defendant has made no independent argument based on Article I, Section 26 of the North Carolina Constitution, which prohibits the use of peremptory challenges solely on the basis of race. *Smith*, 328 N.C. at 119, 400 S.E.2d at 723. For all the foregoing reasons, we conclude the trial court did not err in determining that the prosecutor did not exercise his peremptory challenges in a racially discriminatory manner.

[2] Defendant's next contention is that he was denied a fair trial by the trial court's partisan conduct during *voir dire*. Defendant argues that on many occasions the trial court "exhibited partisanship by frustrating defendant's attempts to remove death-prone jurors." Defendant argues further that the trial court's (i) attempts to rehabilitate prospective juror Morgan and refusal to grant defendant's challenge for cause, (ii) partisan conduct throughout *voir dire* of prospective juror King, and (iii) granting of only one additional peremptory challenge to the defense denied defendant a substantial right. We disagree.

We note first that defendant has made a six-page argument addressing the *voir dire* of prospective juror Willis. However, the record includes no assignment of error based thereon. Defendant argues that under *Morgan v. Illinois*, 504 U.S. ——, 119 L. Ed. 2d 492 (1992), searching *voir dire* must be permitted in order to reveal biased venirepersons who as jurors would always impose death upon a finding of guilt. In the instant case, however, since the trial court granted defendant's challenge for cause of Willis, there could be no *Morgan* violation. In addition, although defendant assigned error on the same ground to the *voir dire* of Moore and Motley, defendant's brief includes no arguments based thereon. Again, since the record shows the trial court granted defendant's challenges for cause of these two venirepersons, there could be no *Morgan* error.

STATE v. SPRUILL

[338 N.C. 612 (1994)]

**[3]**    We next consider defendant's argument that the trial court showed partiality in denying defendant's excusal for cause of prospective juror Morgan. We do not find defendant's argument persuasive. The transcript makes clear that Morgan had some difficulty in following the twists of *voir dire* questioning. She stated to the court that she could follow the law in deciding whether to vote for life or death. The following exchange then took place:

THE COURT: All right. Now, considering your previous statements to [defense counsel] about the death penalty, state whether you would be able to vote for a recommendation of life in prison if the State fails to satisfy you beyond a reasonable doubt of the three things required by law concerning the aggravating and mitigating circumstances previous mentioned?

MS. MORGAN: Would you repeat that?

THE COURT: In other words, would you be able to vote for a recommendation of life imprisonment if the State fails to satisfy you beyond a reasonable doubt of those three things?

MS. MORGAN: I don't quite understand that one.

THE COURT: All right.

Considering your previous statements, I want you to state whether you would be able to vote for a recommendation of life imprisonment if the State fails to satisfy you beyond a reasonable doubt of the three things that I just mentioned?

MS. MORGAN: Oh. No, sir. I wouldn't be able to.

THE COURT: You would not be able to?

MS. MORGAN: No, sir.

THE COURT: You would not be able to follow the law in that respect?

MS. MORGAN: Maybe I should be dismissed because I don't understand all of these things. I can listen to the jury [sic] and I can form my own opinions, but whether it should be a sentence of death or whether it should be life imprisonment, you know all these fancy words and everything, I just can't understand all that.

THE COURT: Would you follow the law as given to you by the Court?

Ms. MORGAN: Yes, sir.

THE COURT: And be guided by the law?

Ms. MORGAN: Yes, sir. That much I can do. I know what you're talking about there. These other fancy words, I'm sorry.

Upon further questioning by defense counsel, Morgan responded, "You're trying to get me tangled up again." Later defense counsel attempted to question Morgan further, but she restated that she would consider the law as given by the trial court. Defense counsel then used a peremptory challenge to excuse her.

Defendant also argues that the trial court erred in denying defendant's challenge for cause of prospective juror King. In response to the prosecutor's asking whether the venire or their family had been victims of a violent crime, King first indicated that his brother had shot someone. The prosecutor asked a second time whether anyone or their family had been hurt or shot. King said that his sister's boyfriend had killed her. Later, the prosecutor asked King if he had been the victim of a crime or charged with a crime. King replied, "One time. I got in a fight with a dude and the gun went off and shot him." Questioned later by defense counsel, King said that in April of 1990, his sister was strangled by her boyfriend. Defense counsel then asked if the matter would have any bearing on King in his deliberations. King answered, "No, sir. It wouldn't," and "It wouldn't, it wouldn't have no bearing on me." Moments later, in response to defense counsel's question, King said, "I've been in favor of the death penalty a long time." Asked how strong his belief was, King answered, "Well, like I told [the prosecutor], I'd have to have both sides of the case first before I make my decision. I have to hear his side and his side, and then I go from there."

Defendant argues further, and the transcript shows, that the challenges for cause of Morgan and King were preserved when defendant exhausted his peremptory challenges and renewed the challenges for cause to these two prospective jurors. However, the transcript also shows that upon defendant's renewal of these two challenges for cause, the trial court granted defendant one additional peremptory challenge. Although defendant also argues that it is not possible to tell which denial the court intended to reverse, we can find no error in the court's denial of defendant's challenge for cause of Morgan.

"The standard for determining whether a prospective juror may be properly excused for cause for his views on capital punishment is

whether those views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *State v. Syriani*, 333 N.C. 350, 369, 428 S.E.2d 118, 128 (quoting *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52 (1985)), *cert. denied*, 510 U.S. ——, 126 L. Ed. 2d 341 (1993), *reh'g denied*, 510 U.S. ——, 126 L. Ed. 2d 707 (1994); *accord State v. Gibbs*, 335 N.C. 1, 29, 436 S.E.2d 321, 337 (1993), *cert. denied*, —— U.S. ——, 129 L. Ed. 2d 881 (1994). Applying this principle in the instant case, Morgan repeatedly said that she could follow the law. Only where a venireperson's responses indicate that her belief about the death penalty would interfere with the performance of her duty at the guilt-innocence or sentencing phases must the trial court grant a challenge for cause. *Gibbs*, 335 N.C. at 29, 436 S.E.2d at 337. Assuming without deciding that the trial court erred in denying defendant's challenge for cause of King, the error was corrected by the granting of an additional peremptory challenge. In sum, since (i) there was no *Morgan* error or error as to prospective juror Morgan and (ii) error, if any, as to prospective juror King was corrected by the granting of an additional peremptory challenge, we overrule defendant's assignments of error. We hold that the trial court's conduct during *voir dire* did not amount to partisan conduct denying defendant a substantial right.

[4] Defendant's final contention relating to *voir dire* is that the trial court erred by denying his motion to permit questioning of prospective jurors on their beliefs about parole eligibility. Again, we disagree.

In *Simmons v. South Carolina*, —— U.S. ——, 129 L. Ed. 2d 133 (1994), the capital defendant was ineligible for parole under South Carolina law. Prior to jury selection, the trial court granted State's motion for an order barring defendant from asking questions about parole. Defendant Simmons was subsequently convicted of murder, and in the penalty phase, evidence tended to show that he posed a continuing danger to elderly women. The prosecutor argued that in its punishment recommendation the jury should consider defendant's future dangerousness. *Id.* at ——, 129 L. Ed. 2d at 139. Defendant's rebuttal evidence, and arguments based thereon, tended to show that he would not be a danger to other inmates. Defendant asked the trial court for an instruction that in his case, life imprisonment did not include the possibility of parole. *Id.* at ——, 129 L. Ed. 2d at 139. Defendant argued there was a reasonable likelihood that the jurors would vote for death simply because they mistakenly believed he would eventually be released on parole. The trial court denied defendant's request. After deliberating for ninety minutes, the jury

sent a note to the trial court asking if a life sentence included the possibility of parole. In response, the court instructed the jury not to consider parole or eligibility therefor and to understand "life imprisonment" in its plain and ordinary meaning. Twenty-five minutes later, the jury returned to the courtroom with a death sentence. *Id.* at ——, 129 L. Ed. 2d at 140.

On appeal, the Court found the State had secured a death sentence partly on the ground of future dangerousness while concealing from the jury the true meaning of a noncapital sentencing alternative, that life imprisonment meant life without parole. The Court held this constituted a violation of due process, *id.* at ——, 129 L. Ed. 2d at 141, but declined to decide that defendant's Eighth Amendment protection was also abridged, *id.* at —— n.4, 129 L. Ed. 2d at 141 n.4. The Court also said as follows:

> In assessing future dangerousness, the actual duration of the defendant's prison sentence is indisputably relevant. Holding all other factors constant, *it is entirely reasonable for a sentencing jury to view a defendant who is eligible for parole as a greater threat to society than a defendant who is not.* Indeed, there may be no greater assurance of a defendant's future nondangerousness to the public than the fact that he never will be released on parole. The trial court's refusal to apprise the jury of information so crucial to its sentencing determination, particularly when the prosecution alluded to the defendant's future dangerousness in its argument to the jury, cannot be reconciled with our well-established precedents interpreting the Due Process Clause.
>
> . . . .
>
> Like the defendants in *Skipper* and *Gardner*, petitioner was prevented from rebutting information that the sentencing authority considered, and upon which it may have relied, in imposing the sentence of death. The State raised the specter of petitioner's future dangerousness generally, but then thwarted all efforts by the petitioner to demonstrate that, contrary to the prosecutor's intimations, he never would be released on parole and thus, in his view, would not pose a future danger to society. *The logic and effectiveness of petitioner's argument naturally depended on the fact that he was legally ineligible for parole and thus would remain in prison if afforded a life sentence.* Petitioner's efforts to focus the jury's attention on the question whether, in prison, he would be a future danger were futile, as he repeatedly was denied

any opportunity to inform the jury that he never would be released on parole. The jury was left to speculate about petitioner's parole eligibility when evaluating petitioner's future dangerousness, and was denied a straight answer about petitioner's parole eligibility even when it was requested.

*Id.* at ——, 129 L. Ed. 2d at 142-43 (emphasis added).

We think it important that the Court did not hold that a defendant has a constitutional right to question the venire about parole. Neither did the Court establish a blanket rule that an instruction giving information about parole or parole eligibility is required in all cases, even if the jury asks a question about parole. Instead, the Court said that in states wherein parole is available, how the jurors' knowledge thereof will affect their recommendation "is speculative, and we shall not lightly second-guess a decision whether or not to inform" them about parole. *Id.* at ——, 129 L. Ed. 2d at 145. Further,

States reasonably may conclude that truthful information regarding the availability of commutation, pardon, and the like, should be kept from the jury in order to provide "greater protection in [the States'] criminal justice system than the Federal Constitution requires." Concomitantly, nothing in the Constitution prohibits the prosecution from arguing any truthful information relating to parole or other forms of early release.

*Id.* at ——, 129 L. Ed. 2d at 145 (quoting *California v. Ramos*, 463 U.S. 992, 1014, 77 L. Ed. 2d 1171, 1189 (1983)) (alteration in original).

It will readily be seen that the instant case is quite different from *Simmons*, wherein the jury was kept in ignorance of truthful information about defendant's parole *in*eligibility. Instead, in defendant's case it would have been entirely reasonable for the jury, if given accurate information about parole, to view him as a greater threat to society. Defendant's case is further distinguishable in that the two prosecutors' arguments, which consume over 100 pages of the transcript, included only one reference to defendant's future dangerousness. Moreover, defendant's jury did not submit to the trial court a question about the effect of a life sentence.

In many capital cases defendants have argued to this Court that they should have been permitted to inform juries that in North Carolina, a life sentence means the defendant must serve twenty years in prison before he is eligible for parole. Often the State has answered that it should have a similar right to respond with accurate informa-

tion about such related issues as the possibility of pardon and com-mutation. From such arguments and from *Simmons*, it appears that our common-law precedents excluding such information from the jury's consideration, *see, e.g., State v. Syriani*, 333 N.C. at 399, 428 S.E.2d at 145, have offered capital defendants greater protection than does federal law. For this reason, and because of significant differ-ences between the instant case and *Simmons*, we hold the trial court did not err in denying defendant's motion to explore during *voir dire* the issue of parole.

SENTENCING ISSUES

[5] Defendant first contends that he is entitled to a new capital sen-tencing proceeding because the prosecutor introduced evidence that defendant had previously been sentenced to death. We disagree.

Before jury selection, defendant moved orally to prohibit the prosecutor from introducing evidence that defendant had been sen-tenced to death after his first trial for the murder of Beatrice Williams. On direct examination, Dr. Groce testified about his 1984-85 psychiatric examination of defendant in connection with the murder. During recross-examination of Dr. Groce, the prosecutor sought to elicit evidence about whether defendant suffered from a conversion disorder which prevented him from walking. The prosecutor read from a report made by a Central Prison psychiatrist after defendant's first trial. The report stated that defendant's "privately retained psy-chiatrist [Groce] had given [defendant] the diagnosis of a conversion disorder." The prosecutor also read as follows:

Q. Now, you go back to the second page that he had, when he finished it off, he's still talking about this same thing, is he not? That was about [defendant's] walking. Said, "Inmate Johnnie Spruill was felt to be somewhat inadequate. When held as a safe-keeper, he became extremely anxious and claimed that he was paralyzed, but on many occasions was observed walking without difficulty."

A. Yes.

Q. "He was seen by Doctor . . ." how do you pronounce it?

A. "Saldias . . ."

Q. ". . . our neurologist here, who did extensive work which revealed no neurological deficits. It was felt as if this was inmate Spruill's conscious wish not to ambulate and there was no evi-dence of . . ." what is that?

STATE v. SPRUILL

[338 N.C. 612 (1994)]

A. "Dissociative disorder."

Q. That means, something wrong with him?

A. It's a specific type of something wrong, but, yes.

Q. "At this time he seems to be making adequate adjustment to his death row environment." Is that correct?

A. Yes.

Q. States that, "He's taken on the Lord," and states that "he reads his Bible everyday [sic] and still having some back pain, but feels like he's going to recover."

A. Yes.

Q. And in this that you were reading right here . . .

MR. WARMACK: Objection. I think Mr. Beard can sit down now.

THE COURT: Sir?

MR. WARMACK: I said I object to Mr. Beard['s] standing up at the witness and reading him the report.

The objection was overruled, and the prosecutor pursued the issue of defendant's alleged conversion disorder through four more pages of the transcript. Evidence was admitted showing that another psychiatrist had confirmed that defendant could walk, and the following exchange took place:

Q. And when you talked about being goal oriented, the defendant could be goal oriented to present things that would appear to you and to other people to put him in the best light. Isn't that a fair statement?

MR. WARMACK: Objection to what is a fair statement.

THE COURT: Overruled.

A. That is possible. He certainly, like most individuals, tries to present himself as well as possible.

Defense counsel then asked a few more questions, and Dr. Groce's testimony came to an end. Dr. Groce asked to be excused, but the prosecutor informed the court that during the luncheon recess he wanted to discuss with defense counsel the admitting of certain exhibits used during Dr. Groce's testimony. The court instructed Dr. Groce to stand by, excused the jurors for lunch, and recessed court.

STATE v. SPRUILL

[338 N.C. 612 (1994)]

After reconvening at 2:00 p.m., the court asked of all counsel, "Anything before the jury is brought in?" Defense counsel answered as follows:

MR. WARMACK: Yes, sir, Judge.

I think now would be as good a time to do it as opposed to running the jury in and out. We have some witnesses here at some point [in] time this afternoon who will testify concerning [defendant] while he has been at Central Prison. They will not be the first witnesses that we would call, but they will be somewhere down the line, and rather than pop the jury back up at that time, I'm just going to go ahead and do it at this time.

I would—earlier we had made a motion in limine to prevent the District Attorney or anyone else from referring to the fact that the defendant was on death row. And I would renew that motion at this time. My reason . . .

THE COURT: (Interjected) Do you have a copy of it? Did you hand it up at one time? I'm going to allow it, but I'm just having trouble remembering.

MR. WARMACK: No, sir. I made that motion orally before we got started. I have not done that in writing.

THE COURT: Did I rule on it at that time? I don't even remember.

MR. WARMACK: No, sir. You just—you said we'd cross it when we got to it. And I guess we're at it now.

THE COURT: All right.

MR. WARMACK: I think my reasons for it are obvious. This jury has got to make its own independent determination and if—I'm sure they probably in their own minds know, but *it hasn't been presented, you know, to them.*

THE COURT: You're sure in their own minds they know what?

MR. WARMACK: That maybe—well, possibly I'll say, I'm sure they may be wondering what he was sentenced to at the last trial, and they ma[y] think they know, *but it has not been brought to their attention.* They have to make their own independent determination and if they found out for sure that another jury had sen-

tenced him to death, it would make it that much easier for them. I would—that's the basis of my motion.

THE COURT: All right. Motion is allowed. Anything else?

MR. WARMACK: No, sir.

(Emphasis added.) Immediately thereafter, defendant presented the testimony of several witnesses, including the following people who met defendant at Central Prison: Chaplain Michael Smith, who met defendant in 1986; Correction Officer Thomas Humphrey, who met defendant in late 1985 or 1986; and Chaplain Luther Matthew Pike, Jr., who met defendant in January 1985.

The next morning, before the jury was brought into the courtroom, the prosecutor raised the issue of the reference to death row:

MR. BEARD: Your Honor, at this time—yesterday afternoon the Court instructed the—before the officers, the correction officers and the ministers got on the witness stand, the Court instructed the State of North Carolina not to ask any questions concerning death row, or the defendant['s] having received the death penalty. And after that occurred, later that afternoon, I recall[ed] that I had inadvertently when mister—on redirect by Mr. Warmack, Mr. Warmack had asked the—Dr. Groce when he was testifying on redirect to read at the bottom of a page entitled "Office Memorandum." And I had earlier asked on, first recross, on my first recross I had asked some questions off of his psychiatric history on that page, and I think I've got a copy . . .

. . . . [Court and prosecutor attempted unsuccessfully to determine which document was at issue.]

THE COURT: All right. Anyway, what happened? What are you referring to?

MR. BEARD: Your Honor, what I'm referring to is—do you have what I'm talking about?

MR. WARMACK: I don't have it, but I'm familiar with the documents

MR. BEARD: All right, sir. The document had to do with a—it was to Nathan Rice, Warden, from James Smith, M.D. And counsel for the defendant had asked on recross, he said, he went through a series of questions with Dr. Groce on recross in which he said, "He seemed somewhat anxious but appeared to be han-

dling himself in [an] appropriate manner. There was no evidence of any delusions, there was no paranoid, suicidal or homicidal ideations. Sleep and appetite were good. Cognition is fair. Insight poor. Judgment fair. Cognition of his personality style poor." That's what he had—and then he asked him to amplify on that. He also mentioned that work-up revealed he was—had marked anxiety and possible psychosis. That was on redirect where counsel was reading from the office memorandum.

I then on recross, then went to the doctor and asked the doctor basically to read, starting with the office memorandum, started with the psychiatric history because I was attempting to show that what the doctor was referring to had to do with the operation of his legs and [was] in that context. I began reading psychiatric history . . . . [Recounts details of psychiatric history.]

Then there was a second page to this that took off where counsel did not read on redirect, and that had to do with psychiatric discussion. "Inmate Johnnie Spruill. . ." I read this to the witness, "Inmate Johnnie Spruill was felt to be somewhat inadequate when held as a safekeeper. He became extremely anxious and claimed that he was paralyzed, but on many occasions was observed walking without difficulty. He was seen by Dr. Saldias, our neurologist here, who did an extensive work-up which revealed no neurological deficits. It was felt as if this was inmate Spruill's conscious wish not to ambulate and there was no hard evidence of disassociative [sic] disorder. At this time he seems to be making an adequate adjustment to his death row environment. He states he's taken on the Lord." And it states that he. . .

THE COURT: You better slow down. The court reporter is looking very intently at you right now.

MR. BEARD: All right, sir. And about that point as I recall, somewhere right about that point[,] I broke off and did not continue reading any further.

Now, I want to bring this to the Court's attention because [I] inadvertently read out where it said, "At this time he seems to be making an adequate adjustment to his death row environment." I did not—I was standing up at the—where the witness was and was reading through the letter to get the entire part of the letter, trying to get the entire part of the letter concerning his legs into evidence. And I did not read—did not—just was not careful, and

unintentionally read that part concerning the death row environment. I want to bring that to the Court's attention, although counsel for the defendant did not object.

The court then asked to hear from defense counsel. Mr. Warmack stated that only then did he remember the death row reference. The court asked whether defense counsel wanted an instruction to the jury "or whether you just desire to go forward with the trial without any further mention of it." After a short, off-record conference between Messrs. Warmack and Harvey, Mr. Warmack stated that they did not want the court to give a limiting instruction. Further, he had (i) objected to the prosecutor's standing before Dr. Groce and (ii) asked to be heard at the bench. If heard, he had intended to object to the prosecutor's reading into the record long passages from the report. However, Mr. Warmack agreed that defense counsel had failed to object to the death row reference. The prosecutor stated that he had received over 200 pages of material relating to Dr. Groce's testimony on the night before he testified, tried to look through it, did not intentionally refer to death row, and brought the matter to the court's attention because he did not want to hide it. The court then instructed the reporter to find the reference. After reviewing the testimony, the court noted that defense counsel's objection did not immediately follow the death row reference. Again the court asked if defense counsel wanted an instruction, and Mr. Warmack responded as follows:

No, sir, Judge, and I think that's one of those situations in which it would be worse to call attention to the mistake than it would be for the—and I don't, you know, and I'll say this for the record, and Mr. Beard was reading everything through it and the way he was reading it, I didn't catch him mak[ing] an issue of that. And I'm not—I'll say this, I'm satisfied with that explanation as far as he is concerned. We would, of course, [prefer] for it not to have been said, but at the same time I think it would do my client more harm now to go back and tell the jury to ignore what they may not have heard to begin with.

The court agreed not to give an instruction and then noted that it accepted the prosecutor's explanation that the reference was inadvertent.

Defendant argues that under *State v. Britt*, 288 N.C. 699, 220 S.E.2d 283 (1975), and *State v. Simpson*, 331 N.C. 267, 415 S.E.2d 351 (1992), the prosecutor's comment entitles defendant to a new sentencing hearing. We disagree.

STATE v. SPRUILL

[338 N.C. 612 (1994)]

In *Britt*, in cross-examining the defendant, the prosecutor referred to defendant's having "sat on death row for the past year" and having been "on death row . . . after you were convicted the last time." 288 N.C. at 708, 220 S.E.2d at 289. Defendant's objection was sustained, and the trial court sent the jury out. "[D]efense counsel moved for a mistrial on the ground that a fair trial by this jury was no longer possible." *Id.* After an in camera conference, the court

> with the consent of defense counsel, recalled the jury and instructed it that defendant previously had been convicted of first degree murder and sentenced to death but his conviction had been reversed by the Supreme Court of North Carolina so that the present trial was entirely new. The judge instructed the jury not to consider the prior trial and not to be influenced to any extent by defendant's prior conviction. Following such instruction defense counsel stated that he desired no further instructions and that his motion for mistrial was withdrawn. Subsequently, upon completion of the trial and during its charge to the jury, the court again instructed the jury to disregard defendant's prior trial and conviction, not to hold it against him, and to render their verdict solely upon new evidence offered at this particular trial.

*Id.* This Court stated that "[c]ross-examination by which the prosecutor places before the jury inadmissible and prejudicial matter is highly improper and, *if knowingly done, unethical. Id.* at 712, 220 S.E.2d at 292 (emphasis added). Further, "[S]ome transgressions are so gross and their effect so highly prejudicial that no curative instruction will suffice to remove the adverse impression from the minds of the jurors." *Id.* at 713, 220 S.E.2d at 292.

We find that the instant case differs significantly from *Britt*. First, the prosecutor made only one mention of death row, and the record makes clear that it was inadvertent. Second, when the remark was made, it went unnoticed by defense counsel or the court and so was never brought to the jury's attention by way of an objection or limiting instruction. Third, defendant did not move for a mistrial. Fourth, from the testimony of Dr. Groce, the prison chaplains, and a prison guard, it was clear that defendant had been in prison since 1984. From this evidence the jury could have inferred already that defendant had previously been sentenced to death; otherwise, he would not be receiving a new capital sentencing hearing. In light of all the circumstances, we cannot say that the prosecutor's inadvertent comment constituted a transgression so gross or highly prejudicial that it alone

constituted the source of adverse impression, if any, in the minds of the jurors.

In *Simpson,* this Court joined "other jurisdictions in declining to impose a *per se* rule that any juror with knowledge that a previous jury returned a recommendation of death for the same murder must be excused for cause." 331 N.C. at 271, 415 S.E.2d at 354. Defendant argues that (i) *Simpson* "mandates inquiry into the issue of prior knowledge of a death sentence when it becomes apparent that a juror has [such] knowledge" and (ii) this Court has said, "When there is substantial reason to fear that the jury has become aware of improper and prejudicial matters, the trial court *must* question the jury as to whether such exposure has occurred and, if so, whether the exposure was prejudicial." *State v. Barts,* 316 N.C. 666, 683, 343 S.E.2d 828, 839 (1986) (emphasis added by defendant). Both *Simpson* and *Barts* are distinguishable from this case for the reason that both involve potentially prejudicial media exposure occurring outside the courtroom. By contrast, in the present case exposure to the potentially prejudicial information occurred during cross-examination with defense counsel present. Defendant not only had the opportunity to observe the extent and manner in which jurors were exposed, but to have a limiting instruction and, if desired, to request an inquiry. Defendant did not make such a request and specifically rejected the trial court's offer to instruct the jury. Furthermore, in the present case the jury's knowledge, if any, of defendant's previous death sentence, could not with certainty be attributed solely to conduct of the prosecutor.

Defendant argues further that he was prejudiced by the introduction, during State's rebuttal evidence, of State's Exhibit 59, a report of clinical notes by psychiatrist James H. Carter, which ended with the following entry: "DISPOSITION: Contact was made with the nurse, Mr. Craft, on Ward 440, who will facilitate this patient's move to Death Row as soon as a bed becomes available." The report was among materials Dr. Groce reviewed in evaluating defendant in 1992. Defense counsel made only a general objection when the State moved admission of the report into evidence and apparently did not examine the report. Again, we cannot find any gross transgression on the part of the prosecutor. Further, as noted above, the jury could already have inferred from defendant's evidence that he had previously received a death sentence.

[6] Finally, defendant argues that he was prejudiced by the State's (i) introduction of photographs of the cellblock in which defendant had

lived since 1985 and (ii) argument to the jury that defendant was "under a twenty-four hour watch in the most secure cell block in the most secure prison in the State of North Carolina." Again, we disagree.

Defendant requested several mitigating circumstances based on his time in confinement, and this was the purpose for which he offered the testimony of the prison chaplains and guard. It was clear from defendant's evidence that he had been in maximum security in Central Prison for six or more years dating roughly from the time of the murder. Under these circumstances, the State was entitled to attempt to rebut any mitigating quality of defendant's evidence. If the jury learned from defendant's evidence that he had previously received a death sentence for the murder of Beatrice Williams, defendant cannot be heard to complain that the State argued against mitigation as arising from that same evidence.

For all the foregoing reasons, we conclude defendant was not prejudiced by the prosecutor's inadvertent remark, the introduction of Dr. Carter's notes, or the prosecutor's argument rebutting mitigation value of defendant's time spent in confinement. We hold defendant is not entitled to a new sentencing hearing based on these assignments of error.

[7]   Defendant's next contention is that in questioning defendant's expert witness Coleman, the trial court improperly expressed an opinion that her evidence was deficient or suspect as to proof of mitigation. We disagree.

Dr. Coleman was accepted by the court as an expert in clinical psychology specializing in neuropsychology and forensic psychology. On direct examination she testified at length about her examination of defendant. The court's first question which defendant complains of came only after testimony consuming about twenty-six pages in the transcript. Defense counsel asked Dr. Coleman about an opinion she furnished before trial, and the following exchange took place:

A.   [Reading from letter] "It is my opinion that each of these factors meets the criteria for mitigation and I note that their combined presence is even more significant. There are interactive effects among them which result in an exacerbation of cognitive intellectual and behavioral deficits. Such as, lower judgment, decreased ability to evaluate, problem solve and consider consequences, and heightened disinhibition (sic). Thus the overall

effect on cognitive processing and behavior, is much greater than would be the case with any single factor."

THE COURT: I'm a little bit lost, ma'am, would you tell me specifically what mitigation this points to?

WITNESS: In terms of, I think, lower cognitive process and mental disease or defect and . . .

THE COURT: (Interjected) Wait just a minute. What?

WITNESS/DR. COLEMAN: Mental disease or defect.

THE COURT: All right.

WITNESS/DR. COLEMAN: Secondary to alcohol and drug abuse . . .

THE COURT: All right.

WITNESS/DR. COLEMAN: . . . history of head injury . . .

THE COURT: All right.

WITNESS/DR. COLEMAN: . . . and borderline intelligence. The combination of those three things.

THE COURT: Amount to what?

WITNESS/DR. COLEMAN: In my opinion it's a mitigating factor.

THE COURT: All right. Thank you.

Defendant argues that the trial court knew what mitigation Dr. Coleman's testimony pointed to and amounted to. Hence, the court had no need to engage in a sufficiency inquiry before the jury and the inquiry "was a display of the judge's negative assessment of the evidence" which was not lost on the jury. We do not find these arguments persuasive.

The Criminal Procedure Act provides, "The judge may not express during any stage of the trial, any opinion in the presence of the jury on any question of fact to be decided by the jury." N.C.G.S. § 15A-1222 (1988). Nevertheless, "[t]he court may interrogate witnesses, whether called by itself or by a party." N.C.G.S. § 8C-1, Rule 614 (1992). Fulfilling the duty "to supervise and control the course of a trial so as to insure justice to all parties, the judge may question a witness in order to clarify confusing or contradictory testimony." *State v. Ramey*, 318 N.C. 457, 464, 349 S.E.2d 566, 571 (1986). In a capital sentencing proceeding the trial court has the duty of deciding which instructions on mitigating circumstances are warranted by the evidence. N.C.G.S. § 15A-2000(b) (1988).

In our view, the questions did not denigrate either defendant's witness or her evidence. Instead, the questions helped to develop testimony favorable to the defense and assist the trial court in its task of deciding whether mitigating circumstances which might later be requested by the defense were in fact supported by the evidence. Considering all the circumstances, we conclude the court did not err in asking the questions; and we overrule this assignment of error.

[8] Defendant next contends that by turning his back during defendant's testimony, the trial judge expressed contempt which prejudiced defendant. Again, we disagree.

The only record reference to the court's action appears on a page entitled "Appearance of Counsel in Superior Court." The last paragraph of a section entitled "Trial Testimony, Exhibits, and Matters Not Appearing in the Trial Transcript" reads as follows: "During the examination of the defendant, the trial judge, sitting at the bench, turned his chair so that his back was to the defendant. This occurred only upon the examination of the defendant and no other witness." In addition, the Certificate of Settlement indicates the record on appeal was settled by expiration of the time for the appellee to respond. Nothing of record indicates where, in relation to the judge's position, the defendant was sitting, whether the judge's back was partially or fully turned, or how long his back might have been turned. Moreover, the transcript is devoid of any indication that the court in fact took such action. During the first part of defendant's testimony, the court ruled on five objections made by the State. Shortly after the fifth ruling, the court instructed the jury to take its midafternoon recess. After court was reconvened, cross-examination began, and the court ruled on numerous objections by defense counsel, overruling some and sustaining others. In addition, one bench conference took place, and once the court sent the jury out and conducted a lengthy *voir dire.* These record facts suggest that the judge could not have had his back to defendant more than a few minutes. Even assuming that the trial judge may have turned his back for a few minutes during defendant's direct examination, the record does not clearly show any prejudice to defendant. For this reason, we overrule this assignment of error.[1]

---

1. This case is clearly distinguishable from *State v. Jenkins,* 115 N.C. App. 520, 445 S.E.2d 622, *disc. rev. denied,* 337 N.C. 804, 449 S.E.2d 752 (1994), in which the trial judge turned his back to the jury for forty-five minutes during the defendant's testimony on direct examination, and the Court of Appeals awarded a new trial.

STATE v. SPRUILL

[338 N.C. 612 (1994)]

**[9]** Defendant's next two contentions relate to the parties' closing arguments. Defendant first contends the trial court erred by failing to intervene ex mero motu during the State's closing arguments. We agree that some of the prosecutors' statements were improper but find no prejudice.

In a capital sentencing proceeding "counsel is permitted wide latitude in his argument to the jury." *State v. Sanderson*, 336 N.C. 1, 15, 442 S.E.2d 33, 42 (1994). In *Sanderson*, the Court also discussed limitations on such arguments:

As we stated in *Britt*: " 'The trial court has a duty, upon objection, to censor remarks not warranted by either the evidence or the law, or remarks calculated to mislead or prejudice the jury. If the impropriety is gross it is proper for the court even in the absence of objection to correct the abuse *ex mero motu*.' " 288 N.C. at 712, 220 S.E.2d at 291 (quoting *State v. Monk*, 286 N.C. 509, 516, 212 S.E.2d 125, 131 (1975)).

*Id.* In *Sanderson* the prosecutor's argument (i) misstated evidence, (ii) suggested personal knowledge of inflammatory facts not of record, and (iii) placed before the jury an aggravating circumstance which the trial court had declined to submit. *Id.* For these and other abuses, this Court concluded defendant was deprived "of his due process right to a fair sentencing proceeding." *Id.* at 20, 442 S.E.2d at 44. Nevertheless, this Court has also said that

prosecutorial statements are not placed in an isolated vacuum on appeal. Fair consideration must be given to the context in which the remarks were made and to the overall factual circumstances to which they referred. Moreover, it must be remembered that the prosecutor of a capital case has a duty to pursue ardently the goal of persuading the jury that the facts in evidence warrant imposition of the ultimate penalty.

*State v. Pinch*, 306 N.C. 1, 24, 292 S.E.2d 203, 221-22 (citations omitted), *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *reh'g denied*, 459 U.S. 1189, 74 L. Ed. 2d 1031 (1983), *overruled on other grounds by State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988), and by *State v. Robinson*, 336 N.C. 78, 443 S.E.2d 306 (1994). With these principles in mind, we turn to defendant's arguments.

In closing, Assistant District Attorney Turner argued to the jury that it should not find as a mitigating circumstance that defendant suffered from a personality disorder with dependency traits, stating as follows:

Now, first of all, what is that anyway? A personality disorder is not a mental illness, first of all. It's just a personality trick [sic], everybody's got their own little personality traits. But he suffers from one, a dependency trait. Did you hear what the doctor based that opinion on? I heard the lawyer come up and ask Dr. Coleman if [defendant] had a dependency trait. And I heard her say, "Oh, oh yes, he does." But did you hear what she based it on? Did you hear what she got that from? I submit to you, ladies and gentlemen, she's getting paid three thousand dollars to work on this case, she'll say anything he wants her to say. "Oh, yes, he's got one." Anything else? What did she base it on, a dependency trait. Is that a mitigating factor? Does that somehow lessen what [defendant] did to Beatrice Williams that night? If it does, ladies and gentlemen, if that is a mitigating factor, then only God can help the women in Northampton County.

In addition, District Attorney Beard argued against the jury's finding as a mitigating circumstance that defendant suffered from chronic seizure disorder. Attempting to distinguish seizures from blackout spells, Beard said as follows:

[T]here's no evidence whatsoever that [defendant's] ever had a blackout spell where it wasn't a seizure. Do you recall m[y] asking Dr. Groce, Dr. Groce, and I'll come back to that in a moment, Dr. Groce, did you ever ask this defendant, did you ever ask him and that's—wouldn't that make sense to you, each one of you, wouldn't that make sense to you, ladies and gentlemen of the jury, reason and common sense, that if someone claims that they've had a blackout spell on April first of 1984, when he couldn't—didn't know anything that was going on, wouldn't you, you don't have to be a psychologist or a psychiatrist, wouldn't you say, well, gee, if that's true, then let's see if he had one before when he says he was doing all this dope everyday [sic]. Let's ask one simple question. One simple question. Has he ever had a blackout spell before, doctor? Doctor, did you ask that question? Well, no, I can't remember that I did. You know darn well he did. You know, he's been paid, you know darn well he did. [Defendant] just didn't have any other blackout spells, and didn't have anything to report, so, he didn't write it down. If [defendant had] had three other blackout spells, I'm not talking about—I'm talking about not where—I'm talking about not epilepsy spells, but blackout spells as of April first, then you might think there might be something to it, but there isn't.

Defendant has cited only one case, *State v. Vines*, 105 N.C. App. 147, 412 S.E.2d 156 (1992), in support of his argument that these remarks were grossly improper. In *Vines*, the court found gross impropriety where a prosecutor attacked an expert witness by arguing, "You can get a doctor to say just about anything these days." 105 N.C. App. at 156, 412 S.E.2d at 162. The court also said the prosecutor elaborated on this theme and implied or suggested that the doctor's testimony was motivated by "pay." *Id.* Although improper, the argument was not prejudicial "in light of the strong and convincing case against defendant." *Id.* at 156, 412 S.E.2d at 163.

In the instant case, assuming arguendo that the prosecutors' statements were improper and should have been condemned by the trial court, they do not entitle defendant to a new sentencing proceeding. As shown from the passages quoted above, the thrust of the lengthy arguments was not that the witnesses had been paid, but that their testimony did not provide a factual basis for finding (i) personality disorder or (ii) blackout spells independent of seizures arising from a disorder. In addition, the statements are nothing like those made by the prosecutor in *Sanderson*.

[10] Defendant also argues that the prosecutors' references to the victim and her lifestyle constituted gross improprieties. We disagree.

In *Payne v. Tennessee*, 501 U.S. 808, 115 L. Ed. 2d 720 (1991), the Court said as follows:

[A] state may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant. "[T]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family."

*Id.* at ——, 115 L. Ed. 2d at 735 (quoting *Booth v. Maryland*, 482 U.S. 496, 517, 96 L. Ed. 2d 440, 457 (1987) (White, J., dissenting)). Before *Booth* was overruled by *Payne*, this Court held several times that prosecutors' de minimus references to victims' rights or those of their families did not constitute gross impropriety. *E.g.*, *State v. Artis*, 325 N.C. 278, 384 S.E.2d 470 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990), *on remand*, 329 N.C. 679, 406

S.E.2d 827 (1991). Since in the instant case the prosecutors' remarks were indistinguishable from those in *Artis*, we conclude the trial court did not err in failing to intervene ex mero motu.

**[11]** Defendant also argues that the prosecutors made improper attacks on defendant by arguing that he (i) had enjoyed stalking and killing the victim; (ii) was a "hound of hell," lay in wait for the victim "like a durned snake," and changed "like a lizard changes colors"; (iii) took notes during the arguments; (iv) attempted to lay blame for the murder on his father; (v) perjured himself in testifying that he had not been convicted of possession of stolen property; (vi) colluded with his attorneys to present himself as remorseful; and (vii) chose to affirm rather than swear to tell the truth. We have carefully reviewed the entire arguments and find they fall within the wide latitude permitted by *Sanderson* and *Britt.*

**[12]** Defendant also argues that he was prejudiced by the prosecutor's comment, made during defense counsel's closing argument, about parole. Again, we disagree.

Defense counsel argued to the jury that defendant's prison record, despite some fights and other problems, showed that he had adjusted well to incarceration and was not a problem inmate. The context of the prosecutor's remark was as follows:

> MR. HARVEY: . . . He's shown that he can live in a structured environment. He's shown that he can live for long periods of time, eight or nine years, in a very restricted structured environment, and perform very well. Remember what the [c]haplain said about him. Remember what the guard, Sergeant Humphr[ey] said. He says he sits there eight hours a day in that control booth and he can see him. He can see inside the cells, he can see through the day room, he can see almost this entire area, and he described [defendant's] conduct and behavior as being good. I'll ask you to find that to be a mitigating factor. I'll argue to you this: That's a good reason to give him life. He's shown you that he knows how to comport himself in prison. And all we're really asking you to do is put him in prison for the rest of his life and not to kill him.

> MR. BEARD: Objection to "the rest of his life," Your Honor, that's not what happens.

> THE COURT: Sir?

> MR. WARMACK: Objection.

**STATE v. SPRUILL**

[338 N.C. 612 (1994)]

MR. HARVEY: Objection.

MR. BEARD: I object to counsel saying put him in jail for the rest of his life. That's not what happens.

MR. HARVEY: Objection to the comment, Judge.

THE COURT: Well, Solicitor, your objection is overruled, and Mr. Harvey[,] your objection is sustained. Go ahead.

MR. HARVEY: Thank you very much, Judge. But that's what these last eight years have shown you. That's what all these 8 x 10 color gloss[i]es (indicated) that Mr. Bread [sic] brought in to you and showed you of the jail. That's what it shows, that [defendant] is able to live.in a structured environment of the prison and perform and function well. It's another reason not to take his life, not to kill him.

As discussed above, this Court has consistently held that parole and parole eligibility are not proper matters for consideration by the jury in a capital.sentencing. Although at the time of defendant's offense, North Carolina was not a state in which a defendant could receive a sentence of life imprisonment without parole, if during deliberations the jurors asked about the meaning of a life sentence, they were instructed that a life sentence means life in prison.[2] In the instant case, defense counsel was permitted to argue in accord with this practice. Since the prosecutor's objection lacked a legal basis, it was improper; and the trial court properly overruled it.

As *Britt* makes clear, when objection is made to the argument of counsel, the trial court has a duty to censor any remarks not warranted by evidence or law. *Cf. Simmons v. South Carolina,* —— U.S. at ——, 129 L. Ed. 2d. at 148 (Souter, J., concurring) ("[O]n matters of law, arguments of counsel do not effectively substitute for statements by the court."); *State v. Brock,* 305 N.C. 532, 540, 290 S.E.2d 566, 572 (1982) (emphasizing duty of court to instruct the jury). However, defendant has not cited, and our research has not revealed, any case holding that when overruling an objection during argument, the court must instruct the jury to disregard the objection.

In the instant case, after the prosecutor's objection was overruled and defense counsel's objection to the objection was sustained,

2. Pursuant to a statutory amendment, North Carolina now has life without parole, N.C.G.S. § 15A-1380.5 (Supp. 1994). For offenses occurring after 1 October 1994, the judge is required to instruct the jury that a sentence of life imprisonment means a sentence of life without parole. N.C.G.S. § 15A-2002 (Supp. 1994).

defense counsel was permitted to argue again that defendant's adjustment to prison was a reason not to take his life. On these facts, this Court cannot find that defendant was prejudiced by the prosecutor's objection.

For all the foregoing reasons, we conclude that all the prosecutors' statements complained of did not result in a denial of " 'that fundamental fairness essential to the very concept of justice.' " *Donnelly v. De Christoforo*, 416 U.S. 637, 642, 40 L. Ed. 2d 431, 436 (1974) (quoting *Lisenba v. California*, 314 U.S. 219, 236, 86 L. Ed. 166, 180 (1941)). Therefore, we overrule these assignments of error.

**[13]** Defendant next contends the trial court erred in its instruction on the statutory mitigating circumstance that the defendant had "no significant history of prior criminal activity." N.C.G.S. § 15A-2000(f)(1) (1988). Defendant argues that in its wording of the instruction, the court presented the evidence relating to this circumstance in the light most favorable to the State, thereby erroneously expressing an opinion on the evidence. We disagree.

The court instructed as follows:

First, consider whether the defendant has no significant history of prior criminal activity. Significant means important or notable. Whether any history of prior criminal activity is significant is for you to determine from all of the facts and circumstances which you find from the evidence. However you should not determine whether it is significant only on the basis of the number of convictions, if any, in the defendant's record. Rather you should consider the nature and quality of the defendant's history, if any, in determining whether it is significant.

You would find this mitigating circumstance if you find that on the first of December, 1983, the defendant pled guilty to misdemeanor possession of stolen property. That on the 12th of December, 1983, the defendant pled guilty to one count of assault on a female and one count of communicating threats to Beatrice Williams; that at some time in the past the defendant was convicted of driving while his license was suspended; that in the middle of March, 1984, the defendant cut Beatrice Williams with a knife; that sometime around 1978, the defendant choked Barbara Spruill, his wife and that this is not a significant history of prior criminal activity.

STATE v. SPRUILL

[338 N.C. 612 (1994)]

Defendant argues further that this instruction did not indicate that evidence relating to his alleged unadjudicated misconduct towards the victim and his former wife was contested. However, since defendant failed to object to the instruction, our review is for plain error. *State v. Gibbs*, 335 N.C. 1, 49, 436 S.E.2d 321, 349 (1993). To constitute plain error, an error in jury instructions must be so fundamental as to have (i) amounted to a miscarriage of justice or (ii) probably resulted in the jury's reaching a different verdict than it would have reached without the error. *State v. Collins*, 334 N.C. 54, 62, 431 S.E.2d 188, 193 (1993).

We find it significant that the court first reminded the jurors that they were to find the facts and circumstances from the evidence. Only then did the court instruct the jurors that they should consider the nature and quality of the defendant's history, *if any*, and would find the circumstance *if* they found that defendant had cut the victim and choked his former wife. Reading the instruction in its entirety, we are persuaded that it did not constitute an improper expression of opinion which probably resulted in the jury's reaching a different verdict. Therefore, we hold the instruction did not amount to plain error.

**[14]** Defendant next contends that the trial court erred in its instructions on two other statutory mitigating circumstances, that the murder "was committed while the defendant was under the influence of mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2), and that defendant's capacity to appreciate the criminality of his conduct or conform it to law was impaired, N.C.G.S. § 15A-2000(f)(6). Again, we disagree.

The court instructed as follows:

2. Consider whether this murder was committed while the defendant was under the influence of mental or emotional disturbance. A defendant is under such influence if he is *in any way affected or influence by* a mental or emotional disturbance at the time he kills.

Being under the influence of mental or emotional disturbance is similar to but not the same as being in a heat of passion upon adequate provocation. A person may be under the influence of mental or emotional disturbance even if he had no adequate provocation and even if his disturbance was not so strong as to constitute heat of passion or preclude deliberation. For this mitigating circumstance to exist, it is enough that the defendant's

STATE v. SPRUILL

[338 N.C. 612 (1994)]

mind or emotions were disturbed, *from any cause*, and that he was under the influence of the disturbance when he killed the victim.

You would find this mitigating circumstance if you find that the defendant suffered from a mental disorder and had poor reality orientation and borderline intelligence and a personality disorder with inadequate and dependent features, and that, as a result, the defendant was under the influence of mental disturbance when he killed the victim.

(Emphasis added.)

Defendant argues that the court's use of "and" meant that a juror's failure to find any one of the factual elements meant consideration of the circumstance was entirely precluded. However, since defendant failed to object to the instruction, our review is for plain error.

In light of the court's preliminary directive that the defendant was under such an influence if he was in any way affected or if his mind or emotions were disturbed from any cause, we do not find defendant's argument persuasive. Reading the instruction in its entirety, we do not believe the jurors could have applied it in a way that prevented "consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380, 108 L. Ed. 2d 316, 329 (1990).

Defendant also argues that by its similar use of "and" in stating the factual predicates which could support the finding of mitigating circumstance (f)(6), the trial court precluded the jurors from finding the existence of this circumstance unless they first found the existence of every fact recited by the court. Again, we disagree.

Before restating the facts tending to support a finding of this circumstance, the court instructed the jury that "for this mitigating circumstance to exist, the defendant's capacity to appreciate does not need to have been totally obliterated." In addition, the court instructed that "the defendant need not wholly lack all capacity to conform. It is enough that such capacity as he might otherwise have had in the absence of his impairment is lessened or diminished because of such impairment."

Again, since defendant failed to object, our review is for plain error. Reading the instruction in its entirety, we do not believe the jury was misled into reaching a result different from the one it would have reached had the instruction not contained the word "and." In

sum, for all the foregoing reasons, we find that the challenged instructions did not amount to plain error.

[15]   Defendant's next contention is that the trial court erred by instructing the jurors that each could exercise his discretion in deciding whether to consider any mitigating circumstance found in Sentencing Issue Two when answering Issues Three and Four. Again we disagree.

The Criminal Procedure Act provides in pertinent part:

> After hearing the evidence, argument of counsel, and instructions of the court, the jury shall deliberate and render a sentence recommendation to the court, based upon the following matters:
>
> (1) Whether any sufficient aggravating circumstance or circumstances as enumerated in subsection (e) exist;
>
> (2) Whether any sufficient mitigating circumstance or circumstances as enumerated in subsection (f), which outweigh the aggravating circumstance or circumstances found, exist; and
>
> (3) Based on these considerations, whether the defendant should be sentenced to death or to imprisonment in the State's prison for life.

N.C.G.S. § 15A-2000(b) (1988). Under this statute, each juror must be

> permitted to consider and give effect to mitigating evidence when deciding the ultimate question whether to vote for a sentence of death. This requirement means that, in North Carolina's system, each juror must be allowed to consider all mitigating evidence in deciding Issues Three and Four: whether aggravating circumstances outweigh mitigating circumstances, and whether the aggravating circumstances, when considered with any mitigating circumstances, are sufficiently substantial to justify a sentence of death.

*McKoy v. North Carolina*, 494 U.S. 433, 442-43, 108 L. Ed. 2d 369, 381 (1990).

In the instant case, the trial court first instructed as follows:

> Issue Three is, "Do you unanimously find beyond a reasonable doubt that the mitigating circumstance or circumstances found is, or are, insufficient to outweigh the aggravating circumstance found by you?

> If you find from the evidence one or more mitigating circum-
> stances, you must weigh the aggravating circumstance against the
> mitigating circumstances. When deciding this issue, each juror
> must consider each—strike that, each juror—When deciding this
> issue, each juror *may consider any mitigating circumstance or
> circumstances that the juror determined to exist by a prepond-
> erance of the evidence in Issue Two.*

Thereafter the court also instructed as follows:

> Issue Four is, "Do you unanimously find beyond a reasonable
> doubt that the aggravating circumstance you found is sufficiently
> substantial to call for the imposition of the death penalty when
> considered with the mitigating circumstance or circumstances
> *found by one or more of you?*"

> In deciding this issue, you are not to consider the aggravating
> circumstance standing alone. You *must consider it in connection
> with any mitigating circumstances found by one or more of
> you.* When making this comparison, each juror may consider any
> mitigating circumstance or circumstances that—strike that. *When
> making this comparison, each juror may consider any miti-
> gating circumstance or circumstances that juror determined to
> exist by a preponderance of the evidence.*

(Emphasis added.)

Again, since defendant did not object to the instructions, our
review is for plain error. Instead of precluding any individual juror
from considering any mitigating circumstance or circumstances she
or he found at Issue II, these instructions plainly directed that the evi-
dence in mitigation, if found by one or more jurors, had to be weighed
against the evidence in aggravation. In our view, the instructions are
in accord with the dictates of *McKoy* and could not have been misap-
plied by the jury. Since there was no error, this Court cannot find
plain error, *State v. Torain*, 316 N.C. 111, 123, 340 S.E.2d 465, 468
(1986); and we overrule this assignment of error.

Defendant also contends the trial court erred in denying his
request for an instruction on parole. However, in light of our earlier
discussion of *Simmons* and case law prohibiting the jury from con-
sidering this matter, we overrule this assignment of error.

[16] Defendant next contends he is entitled to a new sentencing pro-
ceeding because the trial court failed to submit to the jury the statu-

tory mitigating circumstance of his age at the time of the crime. N.C.G.S. § 15A-2000(f)(7) (1988). Defendant argues that (i) chronological age is not the determining factor and (ii) the circumstance was supported by evidence that he was an immature and dependent person who had borderline intelligence. While we agree that chronological age is not determinative, we do not agree that the trial court erred.

We note first that defendant did not request that the trial court submit this mitigating circumstance to the jury. In addition, evidence showed that he was thirty-one years old, had worked as an automobile mechanic and in a shipyard, moved on to a better position, attended church, and functioned quite well in the community.

In *State v. Johnson*, 317 N.C. 343, 346 S.E.2d 596 (1986), the Court reiterated that the statutory mitigating circumstance of age is based on a "flexible and relative concept of age." *Id.* at 393, 346 S.E.2d at 624. Nevertheless, evidence showing emotional immaturity is not viewed in isolation, particularly where other evidence shows "more mature qualities and characteristics." *Id.* Where evidence of emotional immaturity is counterbalanced by a chronological age of twenty-three years, apparently normal physical and intellectual development, and experience, the trial court is not required to submit the mitigating circumstance of age. Following *Johnson*, we conclude that in the instant case the court did not err in failing to submit this circumstance.

[17] Defendant's next contention is that the trial court erred in refusing to submit to the jury certain nonstatutory mitigating circumstances requested by defendant and supported by the evidence. Defendant argues that the jury was precluded from considering some mitigating aspects of his character or record, in violation of *Lockett v. Ohio*, 438 U.S. 586, 604, 57 L. Ed. 2d 973, 990 (1978). We disagree with this contention.

Defendant first argues that the trial court erred in failing to submit that prior to 1 April 1984 defendant had never been involved in a felony. However, the statutory mitigating circumstance that defendant had no significant history of criminal activity was submitted. Moreover, the instruction on this circumstance included an accurate summary of the evidence presented, which showed defendant's prior criminal activity included some offenses resulting in charges and convictions and other offenses which had not resulted in charges or convictions. Since the jury was not precluded from considering any aspect of defendant's record, we conclude the trial court did not vio-

late the rule of *Lockett* by refusing to submit an additional nonstatutory circumstance relating thereto.

**[18]** Defendant next argues that the trial court erred by combining into one circumstance two aspects of defendant's educational background, that he (i) did poorly in school and dropped out before completing eleventh grade and (ii) was placed in special education classes in ninth grade. Defendant also argues that the court erred in combining into one circumstance that he (i) was struck with a poker by his father, (ii) suffered a head injury, and (iii) suffered from chronic seizure disorder. However, this Court has previously held that combining separately-proffered statements of mitigation relating to a single aspect of a defendant's character or record does not violate a defendant's federal constitutional rights. *State v. Greene*, 324 N.C. 1, 21, 376 S.E.2d 430, 442 (1989) (approving combining and submitting within the context of two separate statutory mitigating circumstances defendant's independently proffered mitigation statements), *death sentence vacated on other grounds*, 494 U.S. 1022, 108 L. Ed. 2d 603 (1990); *on remand*, 329 N.C. 771, 408 S.E.2d 185 (1991). For all the foregoing reasons, we conclude the trial court did not err by precluding the jury from considering mitigation proffered by defendant.

PRESERVATION ISSUES

**[19-24]** Defendant raises six additional issues which he concedes have been decided against him by this Court: (i) the trial court erred in denying his motion for individual jury *voir dire*; (ii) the court erred in denying him the right to examine each juror challenged by the State during death qualification; (iii) the court erred in admitting hearsay statements of the victim relating to her state of mind; (iv) the court erred in denying defendant's request for an instruction defining "mitigation"; (v) the court erred in instructing the jurors that it was for them to determine whether the nonstatutory mitigating circumstances in fact possessed mitigating value; and (vi) the especially heinous, atrocious, or cruel aggravating circumstance is unconstitutionally vague.

We have carefully considered defendant's arguments on these issues and find no compelling reason to depart from our prior holdings. Therefore, we overrule these assignments of error.

PROPORTIONALITY

**[25]** Having found defendant's capital sentencing proceeding free of prejudicial error, we are required by statute to review the record and

determine whether (i) the record supports the jury's finding of the aggravating circumstance on which the court based its death sentence, (ii) the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor, and (iii) the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and defendant. N.C.G.S. § 15A-2000(d)(2) (1988); *State v. Robbins*, 319 N.C. 465, 526, 356 S.E.2d 279, 315, *cert. denied*, 484 U.S. 918, 98 L. Ed. 2d 226 (1987).

Record evidence which supports the jury's finding that the murder was especially heinous, atrocious, or cruel included that the defendant assaulted, harassed, stalked, and threatened the victim prior to killing her. Moreover, his presence and actions at the nightclub reduced her to a state of terror, as shown by her crying, shifting her weight from one foot to the other, and wringing her hands. Other evidence showed that defendant's slashing of the victim's throat was especially brutal, since cartilage in her throat had been cut through and through. In addition, the victim drowned in her own blood, and State's expert medical witness testified that this process may take from five to ten minutes. Taken together, these facts show that (i) the murder was physically agonizing to the victim and (ii) left her, in her last moments "aware but helpless to prevent impending death." *State v. Oliver*, 309 N.C. 326, 346, 307 S.E.2d 304, 318 (1983). Therefore, we conclude the record supports the jury's finding of the sole aggravating circumstance upon which the death sentence was based. We further conclude that nothing of record suggests that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor.

We turn to our final statutory duty, proportionality review. We first compare similar cases from a pool of all cases arising after 1 June 1977, the effective date of the capital punishment statute. We consider cases tried capitally and found free of error on direct appeal to this Court and in which the jury recommended death or life imprisonment or the trial court imposed life imprisonment after the jurors failed within a reasonable period of time to agree on a sentencing recommendation. *State v. Syriani*, 333 N.C. 350, 400, 428 S.E.2d 118, 146 (1993). The pool includes only those cases which this Court has found to be free of error in both phases of the trial." *State v. Stokes*, 319 N.C. 1, 19-20, 352 S.E.2d 653, 663 (1987). In *State v. Bacon*, 337 N.C. 66, 446 S.E.2d 542, *petition for cert. denied*, —— U.S. ——, 130 L. Ed. 2d 1083 (1994), this Court clarified the composition of the pool so as to account for post-conviction relief awarded to death-sentenced defendants:

Because the "proportionality pool" is limited to cases involving first-degree murder convictions, a post-conviction proceeding which holds that the State may not prosecute the defendant for first-degree murder or results in a retrial at which the defendant is acquitted or found guilty of a lesser included offense results in the removal of that case from the "pool." When a post-conviction proceeding results in a new capital trial or sentencing proceeding, which, in turn, results in a life sentence for a "death-eligible" defendant, the case is treated as a "life" case for purposes of proportionality review. The case of a defendant sentenced to life imprisonment at a resentencing proceeding ordered in a post-conviction proceeding is similarly treated. Finally, the case of a defendant who is either convicted of first-degree murder and sentenced to death at a new trial or sentenced to death in a resentencing proceeding ordered in a post-conviction proceeding, which sentence is subsequently affirmed by this Court, is treated as a "death-affirmed" case.

*Id.* at 107, 446 S.E.2d at 564. "[A] conviction and death sentence affirmed on direct appeal is presumed to be without error, and . . . a post-conviction decision granting relief to a convicted first-degree murderer is not final until the State has exhausted all available appellate remedies." *Id.* at 107 n.6, 446 S.E.2d at 564 n.6.

Our consideration is also limited to cases roughly similar as to the crime and the defendant, but we are not bound to cite every case used for comparison. *Syriani*, 333 N.C. at 400, 428 S.E.2d at 146. If juries have consistently returned death sentences in those similar cases, a strong basis exists for concluding that the sentence under consideration is not excessive or disproportionate. However, if juries have consistently returned life sentences in similar cases, a strong basis exists for concluding that the sentence under consideration is disproportionate. *Id.* at 401, 428 S.E.2d at 146.

Characteristics distinguishing the instant case include (i) a murder preceded by physical and mental abuse, including assaults and threats, (ii) a senseless and brutal public stabbing found to be especially heinous, atrocious, or cruel by the jury, and (iii) a distinct failure of the defendant to show remorse after the killing. Further, of twenty-three mitigating circumstances submitted, the jury rejected twenty-two, finding the existence of only one nonstatutory circumstance, that the defendant suffered from a personality disorder with dependency traits.

STATE v. SPRUILL

[338 N.C. 612 (1994)]

"Of the cases in which this Court has found the death penalty disproportionate, only two involved the 'especially heinous, atrocious, or cruel' aggravating circumstance." *Id.* at 401, 428 S.E.2d at 146-47 (citing *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983)). Significant dissimilarities between *Stokes* and the instant case include that (i) defendant Stokes was only seventeen years old, but defendant Spruill was thirty-one and (ii) in *Stokes* no evidence showed who was the ringleader, but defendant Spruill alone was responsible for his crime. Defendant's case is also significantly different from *Bondurant*, wherein the defendant immediately exhibited remorse and concern for the victim's life by helping him get medical treatment. By contrast, defendant Spruill (i) immediately said that he meant to kill the victim, (ii) fled the scene, and (iii) soon thereafter suggested to Trooper Harris that medical help would not arrive in time to save her.

In *State v. Spruill*, 320 N.C. 688, 360 S.E.2d 667 (1987), this Court reviewed defendant's first capital trial and sentencing proceeding and considered whether the death sentence he received was disproportionate. We noted that the distinguishing characteristics of the earlier case were as follows:

(1) it is a case of first degree murder, preceded by prior physical and mental abuse of the victim; (2) it is a case in which a single aggravating factor [sic] was found, "that the killing was especially heinous, atrocious or cruel," N.C.G.S. § 15A-2000(e)(9); (3) it is a case in which no mitigating factors were found, although five were submitted to the jury; and (4) it is a case in which defendant showed no remorse for his actions, and appeared in full control of his mental and physical condition.

320 N.C. at 701, 360 S.E.2d at 674. In reaching the conclusion that defendant's sentence was not disproportionate, we reviewed many cases. The only significant difference between defendant's two cases is that the present case is more egregious, the jury having considered and rejected many more mitigating circumstances. For this reason, we do not consider it necessary to review those cases which formed the basis for our conclusion that the earlier sentence was not disproportionate. *See Syriani*, 333 N.C. at 400, 428 S.E.2d at 146. Instead, we consider cases which have come into the pool since our previous review.

There are now in the pool five cases involving murder by stabbing of a spouse or intimate friend of the opposite sex. *State v. Lynch*, 337

N.C. 415, 445 S.E.2d 581 (1994); *State v. Fisher*, 336 N.C. 684, 445 S.E.2d 866 (1994); *State v. Bearthes*, 329 N.C. 149, 405 S.E. 2d 170 (1991); *State v. Clark*, 324 N.C. 146, 327 S.E.2d 54 (1989); *State v. Tidwell*, 323 N.C. 668, 374 S.E.2d 577 (1989).

In every case but *Lynch*, the jury found that the murder was especially heinous, atrocious, or cruel. Given the importance of this statutory aggravating circumstance in capital cases, we conclude that defendant's case is dissimilar to *Lynch*. *Clark* also is distinguishable because the victim was the defendant's husband, but defendant's boyfriend wielded the knife. Of the remaining three cases, one resulted in a death sentence, *Fisher*; and two resulted in life sentences, *Bearthes*; *Tidwell*. In all three cases, however, the juries found mitigation both quantitatively and qualitatively greater than in the instant case.[3] For this reason, and because the jury found the murder was especially heinous, atrocious, or cruel, we cannot say that the death sentence herein is disproportionate. We hold defendant received a fair trial and capital sentencing proceeding free of prejudicial error and that the death penalty is not disproportionate.

NO ERROR.

---

3. In *Fisher*, the jury found eight mitigating circumstances, including two statutory circumstances, that the defendant had no significant history of prior criminal activity, N.C.G.S. § 15A-2000(f)(1) (1988), and was under the influence of mental or emotional disturbance, § 15A-2000(f)(2). 336 N.C. at 709, 445 S.E. 2d at 880. A review of the record in *Bearthes* shows that the jury found seven mitigating circumstances, including two statutory circumstances, no significant history of prior criminal activity and mental or emotional disturbance. In *Tidwell* the jury found twelve mitigating circumstances, including no significant history, mental or emotional disturbance, and diminished capacity. 323 N.C. at 672 n.1, 374 S.E.2d at 579 n.1.